UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
SL GREEN REALTY CORP.,

                                        Plaintiff,                            Case No.: 1:20-cv-8720

   -against-                                                       **COMPLAINT**

CONSTRUCTION & GENERAL BUILDING
LABORERS, LOCAL 79

                                        **Defendant.**
-----------------------------------------------------------------X

      Plaintiff SL Green Realty Corp. ("SL Green" or "Plaintiff") by its attorneys, Milman Labuda Law Group PLLC, hereby complains of Defendant, Construction & General Building Laborers, Local 79, ("Local 79") as follows:

## Introduction

    1.    This is an action brought pursuant to § 303 of the Labor Management Relations Act, 1947, as amended, 29 U.S.C. § 187 ("LMRA"), to recover damages for injuries suffered by SL Green from Local 79's illegal secondary picketing and boycott activity at its midtown headquarters in New York (hereinafter "420 Lexington Ave.").

    2.    Local 79 threatened, coerced, restrained, and aggressively (but unlawfully) attempted to induce SL Green and its employees, the tenants of 420 Lexington Ave., visitors to 420 Lexington Ave., tenants of neighboring buildings, and the general public with an objective to pressure and force SL Green to cease doing business with Alba Construction ("Alba"), or force and influence other neutral entities doing business with Alba to cease working with Alba because Alba is not a signatory employer to a collective bargaining agreement with Local 79.

3. Alternatively, Local 79 sought to pressure, induce, coerce, restrain, and force SL Green to (and/or influence other neutral entities to) award and/or re-assign work being performed or scheduled to be performed by Alba to other contractors who are signatories to collective bargaining agreements with Local 79.

2. Local 79's campaign of torment and terror against neutral and secondary parties is not only unlawful, but results in unconscionably creating a public health hazard by ignoring required COVID-19 pandemic safety mitigation protocols, incessant blowing of saliva-spewing whistles targeted at, and within dangerously close proximity to, SL Green and its employees, the tenants of 420 Lexington Ave., visitors to 420 Lexington Ave., tenants of neighboring buildings, and the general public.

3. Local 79's agents have established a gauntlet with multiple confrontational males perniciously patrolling the narrow sidewalk in front SL Green's headquarters at 420 Lexington Avenue exposing pedestrians and the public to the same dangerous pervasive propelling of saliva and airborne emissions spewing from the Local 79 whistle blowing.

4. Further, Local 79's relentless whistleblowing (targeting neutral parties such as SL Green and its employees, the tenants of 420 Lexington Ave., visitors to 420 Lexington Ave., tenants of neighboring buildings, and the general public) has caused constant lingering ringing effects in the ears of agents of Plaintiff and those unfortunate passersby for as much as one (1) hour after being subjected to the unlawful secondary activity.

5. Local 79's deliberate use of terroristic and tormenting conduct to exert maximum pressure on neutral entities and individuals is designed to achieve its unlawful objective to strong-arm SL Green and force Plaintiff to take action against Alba by either:

    (i) causing the termination of Alba's services at 15 Beekman Street; or

(ii) force Alba to sign a collective bargaining agreement with Local 79; it is also designed to force other neutral entities and the public to stop doing business with Alba.

6. Local 79's conduct violates the National Labor Relations Act's ("NLRA") prohibition against this very unlawful secondary activity.

7. Therefore, pursuant to the statutory protections provided by LMRA § 303, SL Green is permitted to recover its damages from Local 79.

## Parties

8. Plaintiff SL Green is a corporation duly incorporated under the laws of Maryland, with its principal place of business at 420 Lexington Avenue, New York, NY 10017.

9. Upon information and belief, Local 79, is a labor organization with a principal place of business at 131 West 33rd Street, 7th Floor, New York, NY 10001.

10. Local 79 is labor organization that represents individuals who work for a variety of companies engaged in construction demolition in New York City.

## Venue and Jurisdiction

11. This action is brought pursuant to and jurisdiction is founded upon the existence of a question arising under 28 U.S.C. § 1331 and LMRA § 303.

12. Venue lies in this district pursuant to 28 U.S.C. § 1391(b) and 29 U.S.C. §§ 185 and 187. The events complained of have and are continuing to occur within the Southern District of New York and SL Green's primary office location is located in New York, New York.

## Facts

**SL Green's Business**

13. SL Green is a major commercial and residential real estate developer in the City of New York.

14. Its corporate office headquarters is located at 420 Lexington Ave. (also known as the Graybar Building), which SL Green owns and manages the building for corporate tenants.

15. SL Green leases office space to approximately 250 tenants at 420 Lexington Ave.

16. Alliance Security is contracted to provide security guards that are posted in the lobby and at the entrance of 420 Lexington Ave.

17. SL Green is currently developing a five-story dormitory for Pace University in downtown Manhattan at 15 Beekman Street, New York, NY, miles away from 420 Lexington Ave.

18. The demolition work is being performed by Alba Construction – a company that is not a signatory to a collective bargaining agreement with Local 79.

19. No Alba personnel work at 420 Lexington Ave.

20. SL Green has no involvement in Alba's business and its employees, nor any control or involvement in Alba's labor relations matters, including but not limited to whether Alba's employees desire to be represented by Local 79 or any other labor union, if any at all.

21. SL Green does not engage in the business of construction demolition at 420 Lexington Ave.

**Local 79's Unlawful Secondary Conduct.**

22. Beginning on or about September 18, 2020 and continuing to the present, from Monday through Friday, from approximately 7 am to 2 pm, between four to six males inflate a giant balloon rat outside the entrance of SL Green's headquarters at 420 Lexington Ave.

23. The rat is positioned within 10 feet of the entrance on the sidewalk of 420 Lexington Ave. and seven feet from the property line.

24. The rat has a placard affixed to its front that states:

> Shame on SL Green for allowing Alba Services to exploit construction Workers at 15 Beekman "Call Marc Holliday". 212-[xxx-xxxx]. Tell him that New York City Construction Workers deserve a living wage and benefits.

25. The Local 79 picketers relentlessly blow saliva spewing, ear-piercing whistles and shout and yell at: (i) SL Green staff entering and exiting 420 Lexington Ave.; (ii) tenants and visitors of tenants at 420 Lexington Ave.; and (iii) passersby of the general public for hours on end during the course of the day.

26. The picketers have created an unconscionable environment of harassment, annoyance, and intimidation of SL Green and its employees, the tenants of 420 Lexington Ave., visitors to 420 Lexington Ave., tenants of neighboring buildings, and the general public, which is designed to pressure, induce or force SL Green to cease doing business with Alba or force and influence other neutral entities doing business with Alba to cease working with Alba because Alba is not a signatory employer to a collective bargaining agreement with Local 79.

27. Alternatively, Local 79's actions are designed to pressure, induce and force SL Green to and or influence other neutral entities to award and/or re-assign work being performed or scheduled to be performed by Alba to other contractors who are signatories to collective bargaining agreements with Local 79.

26. The union has deliberately and unconscionably dragged neutral parties into its dispute with Alba – conduct that violates the NLRA's prohibition against unlawful secondary activity.

27. LMRA § 303 provides SL Green the right to recover its damages for Local 79's unlawful conduct.

28. Local 79's strategy of deploying multiple picketers blowing saliva-spewing ear-piercing whistles within a few feet of neutral entities and individuals serves as a weapon of torment and torture to any person, including countless innocent bystanders at 420 Lexington Ave. (which is seconds away from Grand Central Station), who must endure the relentless ear-piercing whistleblowing.

29. Local 79's whistleblowing arsenal is not limited to just the excruciating sound it makes; its tactics cross all ethical boundaries and constitute a disregard for human life.  Local 79 picketers, who do not wear masks, shout, scream and blow saliva-spewing whistles within dangerously close distances as few as one to three feet from any person who must go to work for SL Green at 420 Lexington Ave., for any tenant and their employees located at 420 Lexington, and any other individual required to walk by or enter the building.

30. Local 79's terroristic conduct is also creating a public health hazard that induces extraordinary anxiety and fear amongst SL Green and its employees, the tenants of 420 Lexington Ave., visitors to 420 Lexington Ave., tenants of neighboring buildings, and the general public.

31. In or about late March 2020, by Order of the Governor of the State of New York, all non-essential businesses were shut down to minimize the spread of the COVID-19 virus.

32. The Center for Disease Control ("CDC") has determined that the spread of COVID-19 virus occurs through exposure of respiratory droplets emitted through breathing, sneezing, coughing, and talking.

33. The CDC has also determined that infections can spread by exposure to the virus in small droplets and particles that can linger in the air for minutes to hours. The virus may be able to infect people who are further than six feet away from the person who is infected or after that person has left the space.

34. This kind of spread is referred to as airborne transmission.

35. The CDC recommends that people stay at least six feet away from others, whenever possible. This is very important in preventing the spread of COVID-19.

36. The CDC also recommends that people cover their mouths and nose with a mask when around others. This helps reduce the risk of spread both by close contact and by airborne transmission.

37. By Executive Order No. ("EO") 202.17, the Governor of the State of New York ordered that all people in New York must wear masks in public. This executive order was extended by subsequent executive orders (including EOs 202.29, 202.49, 202.55, 202.55.1, and 202.60) and remains in effect.

38. From the start of the pandemic to date, there have been 252,000 COVID-19 infections and 23,861 deaths linked to COVID-19 in New York City alone.

39. There is currently a spike in COVID-19 in 13 zip codes within New York City that has necessitated the shuttering of multiple schools and non-essential businesses therein

40. Local 79's agents do not wear face masks when blowing their whistles or when shouting and yelling in violation of EO 202.17. They shout, yell, and blow saliva-spewing ear-piercing whistles at people standing less than six feet away from them in contravention of CDC guidance.

41. The use of the whistles launches the saliva of the picketers into the air within a few feet of the other people.

42. Local 79's creation of a public health hazard is a particularly pernicious and wanton act of unlawful pressure. Hundreds of thousands of Americans have died in the United States by the highly contagious and lethal COVID-19 virus and millions more have been infected.

43. New York City has enacted uncompromising legal protections to combat this deadly virus that Local 79 wantonly disregards by dispatching its goon squad upon unsuspecting neutral parties, who are innocent bystanders, blowing their spit all over the public.

44. Local 79's conduct imposes a health hazard and sows fear, all with an objective to pressure, induce, or force SL Green to take action against Alba by either causing its termination from 15 Beekman Street and to hire a company whose employees are members of Local 79, or by forcing Alba to sign a collective bargaining agreement with Local 79 – conduct that is purely in violation of the NLRA for which SL Green may recover its damages pursuant to LMRA § 303.

45. In a perversely ironic twist, Local 79 posts on its website COVID-19 guidance which it wants companies who employ its members to follow despite the fact they, themselves, do not heed their own guidance! The union even provides COVID-19 guidance for its members when working – for example, wear a face mask and maintain social distance when possible. The audacity is breathtaking; Local 79 cares about itself to the detriment of the rest of anyone or anything that gets in the way of its parochial quest to expand its rapidly diminishing fiefdom.

46. Local 79's indisputable disregard for the law, public health guidance, and the health and welfare of SL Green and its employees, the tenants of 420 Lexington Ave., visitors to 420 Lexington Ave., tenants of neighboring buildings, and the general public cannot remotely be considered to be peaceful and/or constitutionally protected dissemination of information to the public.

47. Instead, Local 79's terror campaign is designed to exert maximum unlawful secondary pressure to induce or coerce SL Green into taking action against Alba – an entity whose labor relations and employees' desire regarding union representation does not involve SL Green.

48. Aside from the unlawful secondary pressure by Local 79 caused by the shameful disregard for the public's health is its equally abhorrent violation of New York City's noise ordinance.

49. SL Green engaged Cerami Associates ("Cerami"), an acoustics expert, to measure the decibels of the obnoxious whistle blowing to determine whether the decibels exceed the New York City Ordinance, § 24-218 of the New York City Noise Code ("Noise Ordinance"), that allows for no more than 10 decibels above the ambient sound level.

50. Cerami was on site at 420 Lexington Ave. to deploy a noise monitor to quantify the impact of the whistling noises causing complaints. The monitor was deployed at approximately 9:00 am on Wednesday September 30th, and ran continuously until it was retrieved at approximately 2:30 pm that same day.

51. The monitor was deployed directly outside the building on the sidewalk, a public right of way, approximately ten feet from Local 79's agents.

52. Measurements were logged once every second. Additionally, measurements were taken inside in the lobby to quantify the noise impact that the whistling is having within the building.

53. The ear-piercing whistling registered 36 decibels *above* the ambient level, thereby resulting in 26 decibels above the permissible levels that the Noise Ordinance allows for within 10 feet of the entrance of 420 Lexington Ave. Local 79 has thus violated the law with its conduct.

54. Indeed, the ear-piercing whistling registered 26 decibels above the ambient level thereby resulting in 16 decibels above the permissible level that the Noise Ordinance allows for within 15 feet of the entrance of 420 Lexington Ave.

55. Further, the ear-piercing whistling registered 13 decibels above the ambient level thereby resulting in 3 decibels above the permissible level that the Noise Ordinance allows for in the interior of the lobby of 420 Lexington Ave.

56. When the door of the entrance to 420 Lexington Ave. is open, the cacophonous sound of the saliva spewing, ear-piercing whistles and shouting by the picketing aggressors is so great that it impedes the operation of the fire command station, thereby jeopardizing the safety of all people in the building.

57. The noise pollution is so loud that many of the tenants of 420 Lexington Ave. have made repeated complaints to SL Green about: i) the noise; ii) that employees, clients, and visitors have been intimidated and harassed as they enter and leave the building; and iii) that their business operations are being disrupted because of the noise level.

58. The noise level emanating from the chaotic and relentless piercing whistleblowing is massively disruptive and has destroyed all semblance of the quiet and business-conducive environment once enjoyed by SL Green and its employees, as well as other affected neutral entities and individuals utilizing the sidewalk at 420 Lexington Ave.

59. Local 79's disregard for the health of everyone except their own members, with – among other things – the abhorrent use of the shrieking whistles, is designed to bring SL Green to its knees and pressure, induce or force SL Green to either replace Alba with a Local 79 contractor or force Alba to enter into a collective bargaining agreement with Local 79, which is unlawful under the NLRA.

60. Further, Local 79's indisputable violation of the Noise Ordinance is not a peaceful or constitutionally protected means of engaging in a public information campaign.

61. Instead, it is more evidence of unlawful secondary pressure that has dragged in neutral parties in violation of the NLRA's prohibition against unlawful secondary conduct. SL Green may invoke LMRA § 303 to recover its damages as a result of that unlawful conduct.

62. In addition to the public health hazard and noise violations that Local 79's agents present, they also have created a severe atmosphere of fear and intimidation at 420 Lexington Ave.

63. Local 79's agents charge Alliance Security guards at the entrance of 420 Lexington Ave. and blow the saliva-spewing ear-piercing whistles within three feet of the guards.

64. One guard was charged by three picketers when she stepped outside the entrance. The ear-piercing whistling caused the guard extreme distress to the point where she demanded the male picketers stop; they audaciously offered her ear plugs.

65. Another guard observed the disgusting expletives hurled by the picketers at SL Green Chief Executive Officer Marc Holliday ("CEO Holliday"). She observed picketers without face masks charge him at the entrance of 420 Lexington Ave., blowing the saliva-spewing ear-piercing whistles in his face and calling him a "douchebag," "asshole," and telling him "go fuck yourself".

66. The guard also observed a picketer blow the saliva spewing ear-piercing whistle within a few feet of a little girl with her mom – the little girl recoiled as the picketing aggressor got close to her.

67. Video evidence visibly displayed Local 79's agents blowing whistles with saliva undeniably emanating therefrom.

68. An account executive with Alliance Security was subjected to a picketing aggressor blowing a saliva spewing ear-piercing whistle directly into his ear as he approached the entrance

11

of 420 Lexington Ave. His ears rang for an hour afterwards. He felt completely intimidated and antagonized.

69. A senior vice president for SL Green was charged by a picketing aggressor who blew a saliva-spewing ear-piercing whistle directly into his face as he approached the entrance of 420 Lexington Ave. He, too, felt completely intimidated and antagonized.

70. The picketers mill around the entrance of 420 Lexington Ave. blowing saliva spewing ear-piercing whistles without masks, thereby creating a gauntlet for the general public and people entering and exiting to traverse in order to pass through and prevents the public from socially distancing.

71. Indeed, members of the public are forced to maneuver around the public health hazard the picketing male aggressors create in an attempt to maintain a safe social distance.

72. Local 79's saliva-spewing ear-piecing whistles and disregard for government issued social distance mandates by its goon squad has, in effect, resulted in a fear-inducing and anxiety-provoking occupation of the entrance of 420 Lexington Ave. for all neutral entities and individuals entering or exiting the building or walking in front of it.

73. This is precisely the intentional atmosphere Local 79 craves in order to create extraordinary pressure upon SL Green so that they either replace or influence other neutral employers to replace Alba with a Local 79 contractor or force Alba to enter into a collective bargaining agreement with Alba.

74. Local 79's indisputable creation of an atmosphere of intimidation and harassment is not a peaceful and constitutionally protected means of engaging in a public information campaign.

75. The union has dragged neutral parties into its dispute with Alba – conduct that violates the NLRA's prohibition against unlawful secondary activity. LMRA §303 provides SL Green the right to recover its damages for Local 79's unlawful conduct.

76. SL Green has no reasonable anticipation of the public health hazard and atmosphere of intimidation Local 79 is creating abating because the assistant to its CEO Marc Holliday received a call from Local 79 saying "tell Marc Holliday that they will be around the building for many weeks for hiring non-union."

77. Local 79's unlawful secondary pressure targeting SL Green and its employees, the tenants of 420 Lexington Ave., the security personnel at 420 Lexington Ave., the building safety personnel at 420 Lexington Ave., visitors to 420 Lexington Ave., tenants of neighboring buildings, and the general public utilizing the sidewalk in front of 420 Lexington Ave. has forced SL Green to expend resources to ensure the safety of the aforementioned as well as to protect against tenants demanding to end their leases.

78. These expenses include, but are not limited to: (i) the time SL Green staff has had to devote to remediating and remedying the damage caused by the unlawful conduct; and (ii) expenses and costs for vendors and attorneys. In fact, SL Green was compelled to initiate injunction proceedings in the Supreme Court of the State of New York to enjoin Local 79's unlawful terror campaign.

79. SL Green will seek all available remedies and damages in an amount to be determined at trial.

## FIRST CAUSE OF ACTION

80. Plaintiff repeats and incorporates by reference each and every allegation set forth above as if set forth at length herein.

81. Local 79, by and through its agents and/or representatives has threatened, coerced and/or restrained neutral and secondary employers and persons, including SL Green, where an object thereof was to pressure, induce, force or require such neutral and secondary employers and persons to cease using, selling, handling, transporting or otherwise dealing in the products of or business with Alba or to cease doing any business with Alba because Alba is not a signatory employer to a CBA with Local 79.

82. The conduct of Local 79 as aforesaid constitutes unlawful secondary activity which is prohibited by Sections 8(b)(4)(i) and 8(b)(4)(ii) of the NLRA, 29 U.S.C. § 158.

83. The conduct of Local 79 is unlawful pursuant to LMRA § 303, 29 U.S.C. § 187, and SL Green is entitled to seek relief for all available and applicable damages therein pursuant to Section 303(b) thereof.

84. As a direct and proximate result of the above-described unlawful conduct of Local 79, SL Green would not have had to devote time and resources, including those set forth herein, that it would have otherwise not have happened had it not been for Local 79's unlawful secondary conduct.

85. By reason of the foregoing, SL Green is entitled to damages in an amount of its lost profits, additional costs or in such other amount as may be determined upon the trial of this action in excess of $1,000,000.00.

## DEMAND FOR TRIAL BY JURY

86. Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury in this case.

**WHEREFORE**, for all of the reasons set forth above, SL Green, prays for judgment against Local 79 as follows:

A. On the first claim for relief for an order awarding damages in the amount of its costs, lost business, lost fees, lost profits, and/or in such other amount as may be determined upon the trial of this action, but no less than $1,000,000.00, in addition to all available remedies under LMRA § 303.

B. Attorneys' fees, costs of suit, interest (both prejudgment and post-judgment); and

C. Any other and further relief as this Court may deem just, proper, and equitable.

Dated: Lake Success, New York
October 20, 2020

**MILMAN LABUDA LAW GROUP PLLC**

By: _____/s/_____
Joseph M. Labuda, Esq.
Richard Milman, Esq.
Michael J. Mauro, Esq.
Emanuel Kataev, Esq.
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 328-0082 (facsimile)
joe@mllaborlaw.com
rich@mllaborlaw.com
michael@mllaborlaw.com
emanuel@mllaborlaw.com

*Attorneys for Plaintiff*